Doyle E. Collup and Catherine Collup v. Commissioner.
Collup v. Commissioner
Docket No. 85925.
United States Tax Court
T.C. Memo 1962-28; 1962 Tax Ct. Memo LEXIS 279; 21 T.C.M. (CCH) 128; T.C.M. (RIA) 62028; February 12, 1962
Edward E. Moseley, Esq., for the petitioners. Charles B. Sklar, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1957 in the amount of $947.22. The sole issue for decision is the amount of loss sustained by petitioners as a result of the flooding of their residential property in May 1957. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in Fort Worth, *280 Texas, filed a joint Federal income tax return for 1957 with the district director of internal revenue at Dallas, Texas. On their joint return petitioners claimed a casualty loss of $11,600 for damage to their home as a result of a flood in May 1957. The property with respect to which the casualty loss was claimed was purchased by petitioners from a State district court-appointed receiver in June 1955 at a cost of $20,000. The court-appointed receiver had obtained an appraisal of the property by the Fort Worth Real Estate Board as of April 8, 1954. This appraisal showed the fair market value of the property as $25,250. The receiver received several bids upon the property which were presented to the court having jurisdiction over the matter, which court approved the sale of the property to petitioners. The property contains approximately 4 2/3 acres with a 212-foot frontage on Eagle Mountain Lake, Tarrant County, Texas. When petitioners purchased the property in June 1955 it had been vacant for some time. The yard had not been kept and was waist high in weeds. The house was in a state of disrepair with its windows and doors in bad condition, some walls cracked, and light fixtures *281 removed. Due to a long period of drought, the lake had receded and was beyond the end of the dock which caused the dock not to be usable. The land where the lake had receded was overgrown with willow trees, thistles, and weeds. The major improvement on the property at the time it was purchased and in May 1957 was petitioners' house. The house which was constructed about 1949 contains approximately 2,400 square feet consisting of a den, a dining room, a living room, one bedroom, a kitchen, and two baths. It also has a screened porch and an open porch. The house was built on a concrete slab foundation without basement, and the exterior walls are of concrete block covered with stucco. The floors are of asphalt tile laid directly on the concrete slab. Shortly after purchasing the property petitioners mowed down the weeds and willow trees and took out the roots and stumps which were left. They cleaned the house, repainted the interior, covered plaster in the living room with sheetrock, covered the bedroom walls with wood paneling and sheetrock, put a Celotex ceiling in the living room, carpeted the living room and dining room floors, installed wooden window frames in windows which had *282 had only plaster frames, put in aluminum window screens with aluminum frames, installed central heating with an oil furnace, and put in window air conditioners. They also completely re-equipped the house with light fixtures and improved the yard and lawn and planted shrubs. All these improvements were made prior to May 1957. There was a garage on the property at the time petitioners purchased it, and petitioners built a shop onto the garage prior to May 1957. The total area of the garage and shop is 800 square feet. At the time petitioners purchased the property, there was a well on it. Prior to May 1957 this well had gone dry and petitioners had dug a new well on the property. They had also built a redwood pump-house and a radio tower. Petitioners had expended $3,368.10 for which they had receipts or cancelled checks in making improvements to the property between the time they purchased it and May 1957. Petitioners, themselves, had done most of the labor in making the improvements. The $3,368.10 expenditure included some labor payments, and in addition, petitioners had some hired common labor for work on the lawn but had no receipts for such expenditures. Petitioners did all *283 the labor in installing the central heating system and in putting in the aluminum screens with frames on the windows and doors around the house. They built a brick planter box of Roman brick in the living room and one on the patio by their own labor and did the painting and much of the lawn work. They did the labor in building the shop on the garage. Petitioners had received bids for the labor in installing the central heating system ranging from $1,200 to $1,800. In May 1957 petitioners' property was damaged by a flood of Eagle Mountain Lake. During this flood the water reached a maximum height of 24 inches in petitioners' residence, was above floor level for 5 days, and covered some part of the yard for 3 weeks. Before the flood reached their residence, petitioners moved all of their furniture, appliances, carpeting, and other possessions into the garage which is on higher ground than the house and was not flooded. The carpeting was soiled by the heavy rainwaters prior to being removed and further damaged by being ripped from the floor and moved while rain was in progress. The flood caused petitioners' concrete porch to settle one inch, soiled approximately 1,000 square feet of *284 carpeting, damaged asphalt floor tile, sheetrock, and paneled walls, and warped masonite tile board in the kitchen and bathroom. The well which was located on the property when petitioners purchased it was contaminated by the flood. The flood washed away top soil and shrubbery from the lawn. After the flood petitioners placed a new asphalt tile floor in the den, repainted the living room, and put baseboards therein, cleaned the carpeting and relaid it, fumigated the house, planted a new lawn and shrubs, removed a dead tree, caulked and painted the exterior of the house, removed debris, placed new gravel for a driveway, refurbished the electric pump, cleaned the sewer system, and relaid the brick wall. Petitioners have not repaired the concrete porch, replaced the damaged sheetrock, wood paneling, masonite, and much of the asphalt tile, except that the lower part of the wood paneled walls were covered with wainscoting. Petitioners' land was flooded in May 1958 but the water did not come into the house. Petitioners did not claim any casualty loss on their income tax return for 1958. Eagle Mountain Lake is a fresh water, artificial lake that furnishes part of the water supply and *285 flood controls for the city of Fort Worth, Texas, and the surrounding area. Petitioners' property, together with all the property surrounding Eagle Mountain Lake, is subject to a flood easement extending to 19 feet above the spillway level. The spillway is 649.1 feet above mean sea level, the flood easement thus extending to 668.1 feet above mean sea level. There is a reservation in the deeds of the property owners that the property is subject to inundation by flood water to the extent of the flood easement, but there are no restrictions on building, improvement, or other use of the land. Petitioners' house was built within the flood easement as were many of the other houses built around Eagle Mountain Lake. Shortly after the flood of May 1957 petitioners contacted the Fort Worth Real Estate Board and obtained the names of several appraisers who were listed as appraising property for determining the extent of a casualty loss. Only one of the appraisers suggested to petitioners by the Fort Worth Real Estate Board informed petitioners that he did appraisal work of the nature petitioners wanted done. This appraiser, Durward McDonald, Jr., discussed over the telephone with petitioners *286 a method of determining the value of petitioners' property after the flood. On December 18, 1958, McDonald came to petitioners' property and spent between 45 minutes and an hour going over the property. McDonald had been engaged in appraisal work in the Fort Worth area since 1946 and in the real estate business for about 25 years. He has done flood appraisal work for the RFC. McDonald was familiar with the sales of property in the Eagle Mountain Lake area and had appraised other property in that area. At the time he was on petitioners' property on December 18, 1958, he did not know that a flood had occurred in May 1958 which covered the lawn of the property. McDonald saw the watermarks on the house at the level the flood water of May 1957 had reached. He discussed with petitioners the damage that had been done by the flood and was shown the repairs which had been made after the flood. On the basis of his inspection of the house and the other improvements on the property and the information furnished to him by petitioners as to the value of the improvements made to the property by them and the flood damage to the property, McDonald made an appraisal of the fair market value of the property *287 before and after the flood. In his appraisal he gave consideration to the replacement cost of the improvements and the depreciation thereof, as well as his knowledge of prices received upon sales of property in the surrounding area. McDonald, at the time of his appraisal, did not know that petitioners' house was built partially on the flood easement. McDonald concluded in his appraisal of December 18, 1958, that the fair market value of petitioners' property before the flood was $29,000 and its fair market value after the flood was $17,400. Petitioners had no flood insurance on their property. Petitioners on their income tax return computed their loss due to the flood by adding to the $20,000 cost to them of the property, improvements valued at $8,900, thus arriving at a value before the flood of $28,900, and subtracting therefrom $17,300 as the appraised value after the flood. Respondent in his notice of deficiency disallowed $5,631.90 of the casualty loss claimed by petitioners with the following explanation: It has been determined that the casualty loss sustained by the flooding of your property in 1957 did not exceed $5,968.10 and, therefore, the amount of $5,631.90 of *288 the $11,600.00 loss claimed on your 1957 income tax return is disallowed. Ultimate Facts The fair market value of petitioners' property immediately preceding the flood was $26,000, and the fair market value immediately after the flood was $17,400. Opinion The parties agree that the flood of May 1957 was a casualty and that petitioners sustained a casualty loss as a result thereof which is deductible under section 165(a) and (c)(3) of the Internal Revenue Code of 1954. The parties also agree that the extent of the loss is the difference between the fair market value of the property immediately preceding the flood and the fair market value immediately thereafter since neither contends that this amount is greater than petitioners' basis in the property. [1] The test to which the parties point is generally recognized as the proper criteria for determining the amount of a casualty loss. Cf. Helvering v. Owens, 305 U.S. 468 (1938). *289 The question here involved is, therefore, entirely one of fact. Although the appraiser who determined the fair market value before and after the flood at petitioners' request did not physically see the property until December 18, 1958, we are convinced that his appraisal of the value of the property after the flood is substantially correct, and, therefore, have accepted this figure as the value of the property at that time. This appraiser, Durward McDonald, Jr., freely admitted that when an appraiser determines the fair market value of property, such determination regardless of the method used is a matter of the appraiser's judgment and opinion, based on the knowledge he has with respect to the property and his experience in appraisal work. McDonald had a good knowledge of the type and value of property in the area in which petitioners' property was located and a number of years' experience in appraising property in the area. He saw many traces of the flood and was given a fairly accurate report by petitioners of the damage it had done to their property. He had discussed the flood damage with petitioners in a telephone conversation shortly after the flood. However, we are unable *290 to accept his appraisal of the value of the property immediately before the flood. He was not aware that the house was built within the flood easement. He stated that such knowledge would have affected his judgment as to the value of the property whether or not the property had ever been the subject of a flood. It is clear from his testimony that had he known petitioners' house was built within the flood easement, his valuation thereof before the flood would have been less. McDonald obtained from petitioners the estimate of the cost of improvements made by them to the property after they purchased it. There is no evidence to show that petitioners' estimate of costs in addition to the $3,368.10 for which they had receipts, was sufficiently accurate to furnish a proper basis for an appraisal. Petitioners on their return arrived at the value of the property by adding to its cost to them their estimated cost of the improvements thereto including an estimated amount for the cost of their own labor. There is insufficient evidence of record to support petitioners' estimated cost of their own labor in improving the property, but even if this deficiency did not exist, we certainly cannot *291 assume without proof that improvements to property add to the fair market value thereof the exact dollar cost of such improvements. The burden of proof rests on petitioners and they have failed to establish that the improvements they made to the property increased the fair market value thereof by the entire cost of such improvements. Upon considering all the evidence of record, we have concluded that the value of petitioners' property immediately prior to the flood of May 1957 was $26,000, and we hold that petitioners sustained a casualty loss in 1957 of $8,600, which is the difference between $26,000 and $17,400. Decision nill be entered under Rule 50. Footnotes
1. Sec. 1.165-7(b)(1), Income Tax Regs., provides: (b) Amount deductible - (1) General rule. in the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for purposes of section 165(a) shall be the lesser of either - (i) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or (ii) The amount of the adjusted basis prescribed in section 1.1011-1 for determining the loss from the sale or other disposition of the property involved.↩